IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs June 27, 2017

**STANLEY ABERNATHY JAMES v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Knox County
No. 102407   G. Scott Green, Judge**

_____

**No. E2016-01909-CCA-R3-PC**

_____

Stanley Abernathy James ("the Petitioner") was found guilty of second degree murder by a Knox County jury, for which the Petitioner received a sentence of twenty-five years. This court affirmed the Petitioner's conviction and sentence, and our supreme court denied further review.  The Petitioner filed a petition for post-conviction relief alleging ineffective assistance of counsel, which the post-conviction court denied.  On appeal, the Petitioner argues that trial counsel rendered ineffective assistance because trial counsel: (1) failed to fully pursue a defense theory of voluntary manslaughter instead of self-defense; (2) requested a jury instruction that misstated Tennessee law; (3) failed to fully research and investigate potential witnesses; and (4) failed to fully research and investigate the Petitioner's medical history.  After a thorough review of the record and applicable case law, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and CAMILLE R. MCMULLEN, JJ., joined.

Bailey M. Harned, Knoxville, Tennessee, for the appellant, Stanley Abernathy James.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Senior Counsel; Charme P. Allen, District Attorney General; and Kevin J. Allen, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## I.    Factual and Procedural Background

Petitioner was indicted for first degree murder in relation to the shooting of Henry James ("the victim") on August 4, 2009. At the Petitioner's trial, Nyron Roberts testified that he was acquainted with the victim and that he and the victim had been arrested on May 20, 2009, on felony drug charges but only served three months in jail. *State v. Stanley Abernathy James*, No. E2012-01912-CCA-R3-CD, 2013 WL 4680205, at *1 (Tenn. Crim. App. Aug. 29, 2013), *perm. app. denied* (Tenn. Dec. 11, 2013). Mr. Roberts also testified that "he had not had any prior communications or dealings with the [Petitioner]" and that, on August 4, he was at Elander "ET" Mathis's apartment with the victim; the victim's brother, Myron James; Jonathan Jones; and Emmanuel Cooper. *Id.* This court's opinion on direct appeal further summarized the testimony at trial, as follows:

> [Mr. Roberts] said that around 9:00 p.m., he answered Ms. Mathis's door when the [Petitioner] knocked. He said he opened the inside door about half way but did not open the screen door. He said the door opened to the inside. He said that the [Petitioner] greeted the victim and that the victim went to the door and talked to the [Petitioner], although he could not hear their conversation at first. He recalled, though, that the [Petitioner] asked to come inside and smoke drugs with them. He said they did not allow the [Petitioner] inside because it was not their house and Ms. Mathis had gone to the store. He said the [Petitioner] stated loudly that he was unaware Mr. Roberts and the victim had been released from jail quickly and that he thought they were "snitchin' on somebody." He said the victim denied the accusation. He said he heard two shots, felt something hit his leg and burn, and jumped to the side of the couch. He denied that the victim had a gun in his waistband. Mr. Roberts said that he would have known if the victim had a gun and that the victim had been released from jail a day earlier. He denied that any money changed hands or that marijuana was being sold from the apartment.
>
> Mr. Roberts testified that after he heard the shots, he saw the victim's chest smoking and the victim fall to the floor. He said he crawled to the victim and slammed the door. He said that the victim grabbed his hand and put it near the victim's chest wound and that he applied pressure to the wound. He said that he pulled the victim toward the back of the apartment and that the victim was unable to speak. He said he and Mr. Jones did not call 9-1-1 because they did not know the address but that Ms.

- 2 -

Mathis and Myron James returned to the apartment and that Ms. Mathis called 9-1-1. He said that they were concerned an ambulance would not arrive quickly, that they began getting the victim outside to take him to a hospital themselves, and that they had reached the outside steps when the ambulance arrived. He said he saw the victim's girlfriend leave the scene in a van while the victim's body was still there.

. . . .

[On cross-examination,] Mr. Roberts testified that people slept overnight at Ms. Mathis's apartment. He said people also stayed at an apartment on Jourolman Avenue that was behind Ms. Mathis's apartment. He admitted that he and the victim had been arrested in the Jourolman Avenue apartment and that a large amount of crack cocaine and several firearms were found there. He denied that he had any of the guns on his person. When asked if the weapons were the victim's, he said, "No, I'm not saying that." He said Steven Cooper was arrested with them. He thought the victim's bond was $125,000. He said the [Petitioner] was not involved in any business with them.

. . .

Mr. Roberts testified that before the [Petitioner] accused the victim of snitching, the [Petitioner] said he wanted to buy marijuana. After having his recollection of his prior testimony refreshed, he agreed that he had said the screen door was unlocked. He agreed the [Petitioner] never came inside the apartment.

*Id.* at *1-2.

Myron James testified that he was the brother of the victim and that the victim and Mr. Roberts were arrested in May 2009 and were released in August 2009. On the day of the offense, Mr. James left Ms. Mathis's apartment to purchase sodas and cigarettes. *Id.* at *3. He observed "Kim," the Petitioner's girlfriend, and her son get into a van as he left the apartment; he also saw the Petitioner sitting on Ms. Mathis's neighbor's porch.

The opinion on direct appeal further recounts:

Mr. James testified that when he returned, Nyron Roberts and Mr. Jones told him the victim had been shot. He said the victim was lying on the floor inside the front door. He said he called 9-1-1. He said that they

- 3 -

began taking the victim to the car but that a police officer told them it would be better to wait because an ambulance was around the corner. He said, though, he knew the victim was already dead when they carried the body outside. He said he saw a vehicle leave the scene with Kim and the [Petitioner] inside. He said Nyron Roberts and Mr. Jones told him the [Petitioner] shot the victim. He said he did not stop the [Petitioner] from leaving the scene because he planned to "[t]ake [his] own justice." He identified the [Petitioner] in the courtroom as the person he saw with Kim.

On cross-examination, Mr. James testified that he talked to Detective Flores[1] the night of the shooting and gave him information about the [Petitioner's] appearance to help determine the shooter's name. He said that when Detective Flores said "Stanley," he agreed this was the correct person. He said he did not mention the [Petitioner's] leaving with Kim because he wanted to seek justice himself. He said the police did not allow anyone inside the apartment. He said they put down the victim's body when the officer told them the ambulance was nearby. He acknowledged telling the police on the night of the crime that he thought the shooting was due to a romantic rivalry. He said someone told him this but did not remember the woman's name.

*Id.* at *3. Mr. James testified that he did not know the Petitioner prior to the Petitioner's arrival in Knoxville and that the victim did not know the Petitioner because when the Petitioner arrived in Knoxville, the victim was in jail. *Id.* at *3.

Ms. Mathis testified similarly to Mr. James that the victim, Mr. Roberts, and Mr. James were at her apartment on August 4, 2009, and that the victim was shot at her apartment while she and Mr. James were at a nearby market. *Id.* at *4. She also stated that "Mr. Roberts and the victim went to jail in the summer of 2009 and [she] agreed they were not around in June and July 2009." *Id.* at *3. Ms. Mathis testified that "she knew the [Petitioner] as a neighbor because he had been living with Ms. Sharphe." *Id.* at *3. She testified that, while they were at her apartment on August 4, the victim, Mr. James, and Mr. Roberts did nothing illegal; they were not selling drugs, and she did not see any of the three with a firearm. *Id.* at *4.

On cross-examination, Ms. Mathis testified that she lived in her apartment alone and that neither Mr. James nor the victim stayed at the apartment overnight. She stated

---

[1] We note that this individual's name is spelled differently in different pages of the direct appeal opinion. It is unclear from the direct appeal opinion whether Detective Flores and Sergeant Floras are the same individual.

that when she returned from the market with Mr. James, "Mr. Roberts came outside and told them the victim had been shot[]" and that he was panicked. *Id.* Ms. Mathis admitted that she went in and out of the apartment multiple times but "denied that anyone cleaned or disposed of anything[]" and stated that they did not take the victim out of the apartment to prevent the police from searching the apartment. *Id.* Ms. Mathis also testified that she knew the Petitioner, but she was unaware if the Petitioner knew the victim. *Id.* at *5. This court summarized her additional testimony, as follows:

> On redirect examination, Ms. Mathis testified that the area where she lived was nicknamed "the jungle." She said that before the victim was released from jail, his reputation was that he was "snitchin'" or working for the State. On recross-examination, she agreed that people who worked for the State were usually released from jail quickly. She said there were rumors that a person who worked for the State would have his bond lowered. She agreed that the victim was in jail for three months. She denied ever seeing the victim with guns or knowing that "they" sold drugs. She said she never asked Myron James where the victim was when the victim was in jail. On further redirect examination, she agreed she knew the victim and Mr. Roberts were in jail for "cocaine and guns."

> Kimberly Sharphe testified that she met the [Petitioner] two or three months before August 2009 and that they became romantically involved. She said he was from Detroit. She said that when she met the [Petitioner], she lived on Virginia Avenue and that her two minor children were "on the lease" with her. She admitted the [Petitioner] stayed at her apartment "[o]n and off." She said he occasionally helped her financially. She said he "[s]old weed, cut hair, whatever he could do to make ends meet."

*Id.* Ms. Sharphe testified she had a sexual relationship with the victim prior to her relationship with the Petitioner. *Id.* She stated that on August 4, 2009, she went to a nearby market to purchase cigarettes while the Petitioner stayed at her apartment; she did not see Myron James, Ms. Mathis, or Darius Patterson at the market. *Id.*

This court recounted additional trial testimony on direct appeal, as follows:

> Ms. Sharphe testified that Myron James told her the victim had been released from jail the previous Monday. She said people in the neighborhood were talking about the victim being a "snitch." She said the victim was "slingin'," meaning he sold drugs. She said that the [Petitioner] was present when people discussed the victim's being a snitch but that she did not discuss it with the [Petitioner].

Ms. Sharphe testified that as she pulled up to her apartment when returning from the store, she heard two or three gunshots. She said the neighborhood was "in pandemonium." When asked if she saw anyone run past her apartment, she said, "No one in particular." She did not see the [Petitioner] running. She said she went in her front door, found no one inside, and went out the back door. She went to her neighbor's house and found her children. She stated that someone said a person had been hit. She said she went to the front of the apartment and saw the victim's body on the sidewalk. She said Myron James stood over the victim's body and asked her, "Where that n——— go?" She asked who he meant, and he told her that she knew who he meant and that the person shot his brother. She said she had no idea to whom Myron James referred. She called her Aunt Vickie to pick up her children, and she went to her aunt's house. She said that she returned to her apartment later that night to get her children some clothing and that the [Petitioner] was not there.

Ms. Sharphe testified that a detective came to her apartment that night and asked her about the shooting. She said that later that evening, a friend asked to meet her. She said that when she arrived, the [Petitioner] was with her friend. She said that she and the [Petitioner] went to a liquor store on Albert Avenue, that she left the [Petitioner] with her Aunt Vickie and Uncle Gary, and that they went to Nashville. She said they did not part ways in Nashville. She said that she was aware the [Petitioner] was a homicide suspect but that she did not talk to him about the shooting. She said that on the way to Nashville, the [Petitioner] was distraught and upset and cried. She said the [Petitioner] never told her what happened, that the victim had a gun, or that the [Petitioner] acted in self-defense.

On cross-examination, Ms. Sharphe testified that during the time she had a romantic relationship with the victim, the victim had another girlfriend. She said she met the [Petitioner] after she and the victim were no longer involved. She said the victim and his friends were called the Miami Boys. She said that they were known to carry guns and that they sold drugs from multiple apartments, including one near hers and one on Jourolman . . . . She agreed [the Petitioner] was a "hustler" who bought marijuana to sell and use personally. She said he sometimes borrowed money to buy marijuana. She said there were two rumors: that the victim was killed because he was a snitch and that he was killed "over a girl," meaning her . . . . She agreed the [Petitioner] went from her apartment, number 9, to apartment 7 to buy marijuana from the Miami Boys.

. . . .

On redirect examination, Ms. Sharphe testified that she was not aware that the [Petitioner] carried a loaded .40 caliber Smith & Wesson handgun with the serial number removed . . . .

Gary Dyer, Kim Sharphe's uncle, testified that he lived on Albert Avenue in August 2009 . . . . He said he talked to the [Petitioner] in his yard on August 4, 2009. He stated that the [Petitioner] said he had been "put in a bad situation . . . [i]n the project." He said that while they were talking, two police officers arrived and that the [Petitioner] ran the other way, jumping Mr. Dyer's back fence. He said he later learned that Ms. Sharphe brought the [Petitioner] to his house.

On cross-examination, Mr. Dyer testified that the [Petitioner] was upset. When asked if the [Petitioner] cried, Mr. Dyer said the [Petitioner] "was wiping tears." He said the [Petitioner] did not explain the bad situation he faced.

Darrell Ann "Vickie" Dyer, Ms. Sharphe's aunt, testified that she lived on Albert Avenue. She said that on August 4, 2009, the [Petitioner] was Ms. Sharphe's boyfriend. She said that on the evening of August 4, Ms. Sharphe called and asked her to pick up Ms. Sharphe's children and not to ask questions. She said she brought the children to her house . . . . She said that Ms. Sharphe came to her house to check on the children, that she and Ms. Sharphe talked, and that the [Petitioner] arrived fifteen to twenty minutes after Ms. Sharphe. She said the [Petitioner] cried and tried to persuade Ms. Sharphe to go home. She said that police officers ran up her driveway and that she did not see the [Petitioner], who had been outside with her husband . . . .

*Id.* at *5-7.

Jonathan Jones testified that in August 2009, he met with Myron James and the victim to record music at his cousin's apartment; they later went to a woman's apartment to wait on his cousin. *Id.* at *8. The opinion on direct appeal further recounts:

Mr. Jones testified that he thought Myron James and the woman who lived in the apartment went to the store and said he and the others who remained listened to music. He said that no drugs were used and that no

- 7 -

one entered or left the apartment. He said that the victim stood and that he and Mr. Roberts sat on a couch. He said that he heard a knock on the door and that the victim talked with the person on the other side of the door, whom he could not see. He said he was not familiar with the voice he heard but described it as being African-American and not that of a person from the South. He said that the person asked for marijuana but that the victim claimed not to have any. He said that he did not pay attention to all the conversation but that it became heated. He said that the victim locked the screen door and that he heard the person on the other side of the door accuse the victim of "snitchin.'" He said he looked at Mr. Roberts and heard shots. He said the victim fell and hit his head on the steps. He said Mr. Roberts panicked and tried to get the victim away from the doorway. He said he never saw the person who shot the victim.

Mr. Jones testified that police officers arrived within about ten minutes of the shots . . . . He said he and Mr. Roberts, the person with dreadlocks, were inside a police car together and were taken to the police department to meet with investigators. He gave a statement to Investigator Floras. He said he never saw a gun or any cash on August 4 . . . .

*Id.* at *8-9. On cross-examination, Mr. Jones testified that, even though he failed to mention it to investigators at the time, he was certain he saw the victim lock the screen door. *Id.* at *9. He also mentioned that "he did not say in his previous statement that he heard a 'jiggle at the door' and [that he] was afraid someone was coming inside the apartment to kill the witnesses." *Id.* He stated that "he did not hear the nickname Miami Boys that evening." *Id.*

Lieutenant Kenny Miller of the Knoxville Police Department testified on August 4, 2009, at 8:50 p.m., he received a call and drove to Western Heights. *Id.* at *10. He stated that as a supervisor he "wanted to ensure that the scene was preserved, the crime scene log was maintained, and the victim received medical treatment." *Id.* He said that when he arrived at the scene, the victim was receiving first aid treatment from the fire department, and he was told that the suspect had fled in the direction of Jourolman Avenue. *Id.* He testified that he and another officer walked towards the direction that the suspect fled and that they found a gun propped up against a wall. *Id.* The Petitioner and the State stipulated that "at 10:26 p.m., the E911 Center received a call requesting that the police respond to [the Dyers's residence] because the suspect in a shooting was in the yard." *Id.* at *11. Knoxville Police Patrol Supervisor Robert Taylor testified that, in response to the 9-1-1 call, he arrived at the Dyer residence; "a white male stood behind a pickup truck and another figure ducked behind a vehicle and ran toward another house." *Id.* Sergeant Taylor was not able to apprehend the other individual. *Id.*

- 8 -

Knoxville Police Senior Evidence Technician Beth Goodman testified that she processed the scene of the offense "by taking photographs, measuring distances, drawing a diagram, and collecting evidence." *Id.* She found "two 'bullet defects' in the screen door with the 'prongs of the screen' going into the apartment[,]" a third bullet defect "in the concrete railing leading to the second floor of the apartment[,]" bullet fragments, a blood trail, bloody shoe prints and pools of blood in the apartment. *Id.* She was unable to recover the bullet fragment from the wall, but she found a .40 caliber shell casing "on the sidewalk in front of the apartment." *Id.* She also stated that "[a] .40 caliber Smith & Wesson handgun with its serial number ground away was propped against a wall at [an apartment on Jourolman Avenue]"; "nine cartridges were in the gun, eight in the magazine and one in the chamber." *Id.* She stated that "no identifiable fingerprints were found when the evidence from the gun and the apartment was examined." *Id.* Knoxville Police Sergeant Ryan Floras testified that he was the lead investigator in the victim's shooting and that he responded to the scene around 9:00 p.m. *Id.* "He said that the immediate crime scene was at apartment 7 but that it was expanded to include apartment 9 because of a cell phone found at apartment 9." *Id.*

The court's opinion on direct appeal further recounts:

> Sergeant Floras testified that Nyron Roberts and Myron James provided the names Stanley and James but did not know the order of the names and said they knew the suspect was from Detroit. He said that using police databases, the police identified the [Petitioner], Stanley Abernathy James, from Detroit, and issued a "be on the lookout" (BOLO) to patrol officers. He said he was made aware that Sergeant Taylor had chased the [Petitioner] from Mr. Dyer's yard on August 4, 2009. He said he was notified on September 18, 2009, that the [Petitioner] had been stopped in a vehicle in Pennsylvania. The Pennsylvania authorities detained the [Petitioner].

*Id.* at \*12. Sergeant Floras also testified that he searched Ms. Mathis's apartment for drugs, guns, or contraband, but he did not find any of those items. *Id.* On cross-examination, he agreed that the cell phone found in Apartment 9 belonged to Darius Patterson. *Id.* He also agreed that Mr. Jones and Mr. Roberts stated that "the victim was shot because he was a snitch[,]" but he also acknowledged that Mr. James stated in his interview that the victim was killed "over a girl." *Id.*

Knoxville Police Department employee Patricia Resig testified that "the cartridge case from the scene and the bullet from the victim's body were fired from the gun from the scene." *Id.* Tennessee Bureau of Investigation (TBI) Special Agent Don Carmon

testified that the handgun was fired from twelve inches or less from the screen door; he noted that he did not find any gunshot residue on the victim's shirt" and that "the screen could have prevented any residue from reaching the shirt." *Id.* TBI Special Agent Jennifer Milsaps testified that the handgun contained DNA from at least two individuals and that "DNA of the major contributor was consistent at four of thirteen locations with the [Petitioner's] DNA and was inconclusive due to insufficient or degraded DNA at the remaining locations." *Id.* at *13. She also stated that her test of the cell phone did not indicate the presence of blood and that "a partial DNA profile from the cell phone was consistent at three locations with a sample from Darius Patterson and that the [Petitioner's] DNA was not on the cell phone." *Id.* Dr. Darinka Mileusnic-Polchan testified that the victim died of a gunshot wound to the chest, that the manner of his death was homicide, and that abrasions around the wound contained metal fragments that were consistent with a metal screen. *Id.*

> The [Petitioner] testified that he was from Detroit and came to Knoxville in March 2009 to visit relatives. He said he stayed at his sister's apartment. He met Kim Sharphe, became romantically involved with her, and moved into her apartment, which he identified as unit 9 on Virginia Avenue in the Western Heights housing project. He said that he was not working but that Ms. Sharphe worked, paid the rent, and provided groceries. He said the Miami Boys frequented the apartment next door, which he said was unit 7.

> The [Petitioner] testified that the Miami Boys had the neighborhood "on lock down," meaning they sold drugs. He identified an apartment two units from apartment 9 as the "weed spot" and an apartment on Jourolman Avenue behind apartment 9 as the "heavy stuff apartment" where drugs like crack cocaine, heroin, and ecstasy were sold. He said the Miami boys had guns. He identified the Miami Boys as NY, MJ, E, Hen, and Coupe. He said MJ was Myron James and Hen was the victim. He said that N.Y. was Nyron Roberts and that he had dreadlocks. He said that E went to jail about two weeks before the crime and that he was light skinned with dreadlocks.

*Id.* at *12-13. The Petitioner stated that he purchased an ounce of marijuana from the Miami Boys once or twice a month, smoked half of the marijuana, and sold the remainder. *Id.* at *14. The Petitioner also stated that "he never saw the Miami Boys without a gun"; however, "[h]e acknowledged that the .40 caliber weapon in evidence was his gun and said he carried the gun when he lived in Western Heights." *Id.*

- 10 -

This court further summarized the Petitioner's testimony, as follows:

Regarding August 4, 2009, the [Petitioner] testified that he heard the Miami Boys had purple kush marijuana and that he wanted some. He said that while Ms. Sharphe went to the store in her aunt's van, he went to apartment 7 to buy marijuana. He said he had his gun in his right pocket but did not have a cell phone. He said he knocked on the screen and identified himself as Sosa. He said that the "big door" opened and that Nyron Roberts and the victim came to the screen door. He saw the victim's gun in the victim's right waistband. He said Mr. Roberts moved away from the door. He said he asked for an ounce of purple kush for $500, that the victim acknowledged they had the marijuana, that the victim cracked the screen door, that he gave his money to the victim, and that the victim closed the screen door. He stated the victim said, "Come back in an hour and I got you. I'll take care of you." He said he responded, "Oh, dog, I thought you had it on deck." He said that in a drug transaction, the drugs were usually provided immediately. He stated that the victim again said he would provide the marijuana later and that the [Petitioner] said, "Come on now, man; you know how it go. I give you the money for the weed; you give me the weed. I'll go ahead about my business. It don't work like that." He said he should not have said it.

The [Petitioner] testified that after he asked for his money, the victim "went all to hell." He stated that the victim angrily said, "B—— a——, n———,[] what the f——? You think I'm tryin' to play you or somethin', n———?" He said that the victim thought the [Petitioner] did not trust him and that the victim seemed insulted. The [Petitioner] said he became nervous and put his hand in his pocket. He said he told the victim that the victim tricked him and asked for his money. He said he reached for the screen. He said the victim reached for the victim's gun and said, "B—— a——, n———, who the f——." He thought the victim was about to kill him, and he pulled out his gun and shot twice, striking the victim. He said he ran away. He said he put down the gun. He acknowledged he did not call 9-1-1 or the police. He agreed that he was taken into custody in Pennsylvania in October 2009 and that he had been in jail since then.

*Id.* at *14-15.

On cross-examination, the Petitioner agreed that he had previously been convicted for possessing firearms in January 2005 and for delivery of a controlled substance in June 2007; he also agreed that he was on probation when he arrived in Tennessee and that he

was not allowed to possess a handgun. *Id.* at \*15. He explained that he carried a handgun for "personal safety[.]" *Id.* He agreed that he obtained the .40 caliber handgun used in the offense approximately two weeks before the offense. *Id.* The Petitioner agreed that he smoked and sold marijuana daily. *Id.* He asserted that he obtained the .40 caliber handgun because "it was rough out there." *Id.* The Petitioner denied creating the "Miami Boys" nickname for the purpose of his trial, but he agreed that there were rumors in the community that the victim had been snitching. *Id.* at \*16. The Petitioner also agreed that he was aware of the victim's prior relationship with Ms. Sharphe; however, "[h]e did not know if Ms. Sharphe had romantic feelings for the victim when he killed the victim." *Id.* He agreed that he was "hangin' out" with Mr. Patterson prior to the offense. *Id.*

The court's opinion on direct appeal further recounts:

> The [Petitioner] disagreed that neither he nor the victim had somewhere to go when they faced off with guns. He demonstrated the victim's actions that placed him in fear for his life. When asked if he intended to kill the victim, he said he intended to shoot the victim. He acknowledged he aimed for and hit the "center mass" of the victim's body. He agreed he shot twice. He denied that he saw the victim fall. He agreed the second shot had a downward trajectory as shown by its strike at [twenty-two feet] of a concrete pole because he shot down at the victim as he fell. He said everything happened quickly.

> The [Petitioner] testified that he ran away because he was scared of the Miami Boys. He acknowledged placing the gun against a building but denied wiping away fingerprints on the gun. He said he jumped some fences and ran to "Sparkles's" house in the "Ville." He said that his first access to a phone was at Sparkles's house and that he chose not to call the police. He agreed he contacted Kim Sharphe and told her to take him out of town. He agreed he stopped at a liquor store before going to Albert Avenue. He acknowledged that he knew the police were looking for him and that he saw helicopters searching for him.

> When asked why he first advanced his self-defense theory at the trial, the [Petitioner] testified that he was scared and panicked. He did not think the victim's family would believe him. He agreed that he could have provided the police with information about the Miami Boys'[s] criminal enterprise and that he ran because he was guilty.

- 12 -

*Id.* The Petitioner and the State stipulated that the victim had previously been arrested for "drug and weapons charges on October 22, 2008, January 2, 2009, and May 20, 2009." *Id.* at *17. Following deliberations, the jury found the Petitioner guilty of second degree murder, and the trial court sentenced the Petitioner to "twenty-five years at 100% as a Range I, standard offender." *Id.*

The Petitioner later filed a pro se motion for appointment of new counsel because "he did not know whether his trial counsel had filed a motion for a new trial," and he alleged he received ineffective assistance of counsel at his trial. *Id.* The trial court appointed new counsel for the Petitioner, who filed a petition for post-conviction relief that requested a delayed direct appeal. *Id.* The post-conviction court granted the Petitioner's "oral motion to file a delayed motion for a new trial and notice of appeal." *Id.* The trial court denied the Petitioner's motion for new trial after a hearing. *Id.* On direct appeal, a panel of this court affirmed the Petitioner's conviction. *Id.* at *18-19.

*Post-Conviction Proceedings*

The Petitioner filed a timely pro se petition for post-conviction relief. After appointment of counsel, the Petitioner submitted an amended petition, arguing that he received ineffective assistance of counsel both at trial and on appeal. At an evidentiary hearing, three witnesses and the Petitioner testified. Prior to the Petitioner's calling his first witness, the parties stipulated that Investigator Andrew Boatman spoke with Miranda Davidson on the day of the shooting, but he no longer had any recollection or notes of that conversation.

The Petitioner's first witness was Miranda Davidson, who testified that on August 4, she was babysitting Ms. Sharphe's children at Ms. Sharphe's apartment in Western Heights. Ms. Davidson testified that some time before the shooting the Petitioner visited Ms. Sharphe's apartment seeking to purchase marijuana, but the seller was not at the apartment. Ms. Davidson testified that the Petitioner knocked on the door, asked about buying some marijuana, and after Ms. Davidson told him the seller was not there, he left. She testified that, besides Ms. Sharphe's two children, she was the only person in the apartment. She testified that she told investigating police officers this information and gave them her name. After August 4, Ms. Davidson testified that she was not contacted about the shooting again. She testified that she was not avoiding speaking with anyone about the shooting and that, if the Petitioner had requested, she would have testified truthfully at trial.

On cross-examination, Ms. Davidson testified that the Petitioner and Ms. Sharphe were romantically involved and that the Petitioner lived at the apartment, but, on August 4, 2009, the two were in the midst of a disagreement. Ms. Davidson testified that the

- 13 -

Petitioner had not been inside the home while Ms. Davidson was babysitting. Ms. Davidson testified that the Petitioner knocked on the door of the apartment instead of just walking in because he and Ms. Sharphe were "into it" and the two were not speaking. Ms. Davidson testified that she knew Darius Patterson and that Mr. Patterson was friends with the Petitioner. She claimed that she had not seen Mr. Patterson that day and that he was not in Ms. Sharphe's apartment while Ms. Davidson was present on August 4. Ms. Davidson testified that she did not know why Mr. Patterson would testify that he was at Ms. Sharphe's apartment with the Petitioner splitting up pills at the kitchen table and reiterated that she did not see him.

The Petitioner testified that he spoke with trial counsel about his case but that there was a two and a half month period of time when he had no contact with trial counsel because trial counsel's license was suspended. After trial counsel's license was reinstated, the Petitioner spoke with trial counsel a week before trial on three or four separate occasions. The Petitioner testified that, at his meetings with trial counsel, they discussed what happened on August 4 in detail and developed a strategy to obtain a conviction of manslaughter rather than first degree murder. The Petitioner testified that trial counsel led the Petitioner to believe they would pursue a manslaughter charge; however, trial counsel changed the defense from voluntary manslaughter to self-defense in the middle of trial. He testified that he only had brief conversations with trial counsel about the possibility of a self-defense claim, but it was clear to the Petitioner that he was not eligible for the defense. The Petitioner believed that, because he was engaged in an unlawful activity at the time of the shooting, he could not claim self-defense. The Petitioner testified that he discussed Ms. Davidson with trial counsel, stating that she was his "only witness" who could testify as to why the Petitioner was in the Western Heights area on August 4. The Petitioner testified that he believed trial counsel had contacted Ms. Davidson and that she would testify at trial.

The Petitioner testified that, in 2000 while in Detroit, he was the victim of a robbery, and he was shot in the head and the neck. He stated that, after the robbery, he received medical treatment and was diagnosed with Post Traumatic Stress Disorder and later Bipolar Disorder. He explained that he was put on medication as part of his treatment but that he stopped taking the medication because he did not like the way it made him feel. The Petitioner testified that he was unable to work as a result of the injury and that he received disability benefits. He stated that he told trial counsel all of this information and that he still suffered from temporary blackouts from the injury. The Petitioner testified that he believed it would have been in his best interest to seek a medical evaluation prior to trial and requested that trial counsel arrange an evaluation, but he never received one. He told trial counsel to obtain a copy of his medical records, but trial counsel never asked the Petitioner to sign a medical release form and never obtained a copy of his medical records.

The Petitioner testified that, after his conviction, he attempted to contact trial counsel to see when trial counsel would file a motion for new trial and an appeal and requested trial counsel to forward him his legal file in order to have another attorney review it, but trial counsel never responded. The Petitioner testified that, after he contacted the trial court and discovered that nothing had been filed on his behalf, the trial court appointed appellate counsel to represent him.

The Petitioner testified that appellate counsel reviewed his file and determined that the trial court had incorrectly considered an enhancement factor during sentencing. Appellate counsel filed a motion for a new trial arguing that issue, and the trial court agreed that it had incorrectly applied that enhancement factor, but nonetheless, the trial court did not change the Petitioner's sentence of twenty-five years. The Petitioner testified that appellate counsel filed an appeal on the Petitioner's behalf, arguing only that the evidence at trial was insufficient to warrant the Petitioner's conviction. The Petitioner testified that he discussed with appellate counsel the possibility of appealing his sentence, but appellate counsel decided not to introduce that issue on appeal.

The Petitioner testified that he did not believe trial counsel did a good job in representing him at trial. He claimed that trial counsel manipulated him by leading him to believe that he was going to argue for a voluntary manslaughter conviction but instead argued for a self-defense strategy at trial. The Petitioner testified that he did not want to pursue that strategy.

On cross-examination, the Petitioner testified that he understood that the penalty for first degree murder was fifty-one years at one hundred percent and that he received twenty-six years less than that penalty because the jury convicted him of second degree murder. The Petitioner acknowledged that, if trial counsel had succeeded on his theory of self-defense, the Petitioner would have been acquitted. The Petitioner testified that he believed he was ineligible for a self-defense claim because he had done his own research and determined that he could not claim self-defense because he was engaged in an unlawful act at the time of the shooting. However, the Petitioner later admitted that he was unaware that in a self-defense claim, an individual engaged in an unlawful activity has a duty to retreat before engaging in self-defense but is not entirely precluded from the use of self-defense.[2] The Petitioner testified that he did not inform trial counsel that he

---

[2] At the post-conviction hearing, the State pointed out to the Petitioner that his understanding of the law of self-defense was incorrect. According to Tennessee Code Annotated section 39-11-611(b)(1):

> Notwithstanding [section] 39-17-1322, a person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force against another person when and to the degree the person

was doing his own independent legal research to determine what his defense should be. The Petitioner testified that his primary complaint with trial counsel not calling Ms. Davidson to testify at trial was because she would have testified that the Petitioner was looking to purchase marijuana on August 4. The Petitioner stated that, on August 4, he and Ms. Sharphe were in the middle of a disagreement and were not speaking. He testified that he and Ms. Sharphe had "that type of relationship" where it was not unusual for the Petitioner to knock on her door in order to purchase marijuana from her, even though the two were arguing.

The Petitioner testified that he wanted to appeal his sentence and that appellate counsel did not tell him that he could not appeal his sentence because the trial court relied on other enhancement factors beside the one erroneously applied. The Petitioner testified that, even though he sometimes had problems understanding the nature of things that were happening in his case; he knew that he was being prosecuted for a criminal offense, he knew who the Assistant District Attorney, the trial court, and trial counsel were, and he knew that killing the victim was wrong. On redirect examination, the Petitioner testified that trial counsel never talked to him about requesting a change in the jury instructions.

Appellate counsel testified that he was an attorney in private practice in Knoxville and had been in practice since 1996. He stated that his practice was primarily focused on post-conviction and criminal appellate work and that most of his time was spent reviewing other people's work and reviewing court records to locate errors. Appellate counsel was appointed to the Petitioner's case for the purpose of filing a post-conviction claim; he noticed that trial counsel did not file a direct appeal, so he pursued a delayed appeal. Appellate counsel testified that he explained to the Petitioner the importance of filing an appeal before filing for post-conviction relief and that the time to argue ineffective assistance of counsel in relation to trial counsel's representation of the Petitioner at trial would come after the appeal.

Appellate counsel testified that he reviewed the record and discussed the case with trial counsel and the Petitioner. He stated that, overall, the trial "was a pretty clean trial."

---

reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force.

Tenn. Code Ann. § 39-11-611(b)(1). Therefore, an individual who is engaged in unlawful activity or is not in a place where to person has a right to be has a duty to retreat *before* threatening or using force against another in self-defense. Such an individual is not entirely precluded from using force in self-defense, but the individual must satisfy the duty to retreat before the use of force is justified. *See, e.g., State v. Deanty Montgomery*, No. E2014-01014-CCA-R3-CD, 2015 WL 3409485, at *7 (Tenn. Crim. App. May 28, 2015), *perm. app. denied* (Tenn. Oct. 15, 2015).

He identified one issue in the record: the improper use of the multiple victims enhancement factor. Appellate counsel explained that, if the trial court based its sentencing ruling on permissible reasons, it had the discretion to sentence a defendant to any amount of time statutorily allowed in the appropriate range. Appellate counsel stated that, even though the trial court erroneously relied on the multiple victims enhancement factor, the trial court correctly relied on a number of other valid factors. Appellate counsel explained that, at the motion for a new trial, the court corrected itself, reevaluated its sentencing decision without the multiple victims enhancement factor, and again ordered the Petitioner to serve twenty-five years. Appellate counsel testified that, after the court corrected the error, there remained no other legal errors to appeal regarding the Petitioner's sentence. Appellate counsel stated that the only argument he could raise on appeal was a sufficiency of the evidence issue. Appellate counsel testified that trial counsel defeated premeditation and "did an excellent job at trial" even though the result was not the best possible result for the Petitioner. Appellate counsel acknowledged that trial counsel sought a jury instruction on self-defense that did not properly state the law. Appellate counsel testified that, if the jury had returned a verdict of first degree murder, he believed it would have been justified by sufficient evidence.

On cross-examination, appellate counsel testified that in his review of the transcript he noticed that trial counsel requested that the trial court modify the self-defense jury instruction to omit the language that stated that, in order to claim self-defense, the defendant could not be engaged in unlawful activity. Appellate counsel explained that the portion of the instructions on unlawful activity was important and that the trial court was correct in rejecting trial counsel's request. Appellate counsel stated that he understood why trial counsel asked for a change in the instruction, which was to distract the jury from the fact that the Petitioner was engaged in an illegal activity during the offense, but he did not believe that trial counsel actually thought the trial court would omit the language. Appellate counsel believed that the instruction given to the jury by the trial court correctly stated the law of self-defense in Tennessee. Appellate counsel testified that, in his review of the transcript, it did not appear that trial counsel cited any statute or case law as a basis for his request to omit the language from the jury instructions because appellate counsel did not believe any such authority existed. Appellate counsel did not believe that a theory of self-defense was incompatible with the facts of the case, but he stated that it was not in the Petitioner's favor due to the fact that the Petitioner was engaged in unlawful activity. Appellate counsel testified that he was unaware of any evidence in the case that suggested the Petitioner retreated or attempted to retreat prior to shooting the victim.

Gary Lamb testified that he was a private investigator and owner of Lamb Investigations. He testified that he had been a private investigator for eleven years and that almost all of his investigations were criminal defense investigations. He stated that

he had worked for multiple attorneys in Knox County and other surrounding counties, including trial counsel, who was Mr. Lamb's father-in-law. Mr. Lamb testified that he often worked with trial counsel on his cases and that one hundred percent of trial counsel's practice involved criminal defense. Mr. Lamb testified that trial counsel had a reputation of being a very successful defense attorney and that he was well thought of in the legal community.

Mr. Lamb testified that he was employed by trial counsel to investigate the Petitioner's case. Mr. Lamb testified that he engaged in weekly conversations with trial counsel about different strategies for the Petitioner's case. Mr. Lamb testified that trial counsel requested that he contact both Mr. Patterson and Ms. Davidson as part of his investigation. Despite his attempts, Mr. Lamb was unable to contact the two because they were both evasive and made it known that they did not want to speak with Mr. Lamb. Mr. Lamb testified that the Petitioner told him that, prior to the shooting, the Petitioner, Mr. Patterson, and Ms. Davidson were all together inside the apartment of Ms. Sharphe, and that the Petitioner and Mr. Patterson were separating drugs in the kitchen. Mr. Lamb testified that, based on this information, it was decided by trial counsel that the testimony of Mr. Patterson and Ms. Davidson would not be compatible with the defense theory that trial counsel chose. Mr. Lamb stated that he never believed the Petitioner failed to understand what was happening around him or that the Petitioner's mental health might be in question. Additionally, the Petitioner never acknowledged that what he did was wrong.

On cross-examination, Mr. Lamb testified that, when he attempted to find Ms. Davidson, her neighbors told him that she did not want to speak with him or be involved in the case because she was scared. Mr. Lamb testified that he was aware of the Petitioner's head injury, but he never requested nor reviewed any the Petitioner's medical records. Mr. Lamb testified that trial counsel chose to pursue a self-defense argument despite knowing that there might be some issues with a self-defense theory. Mr. Lamb testified that he was aware that the Petitioner testified at trial and that the Petitioner never mentioned being with Mr. Patterson or dividing drugs with him on August 4. Mr. Lamb testified that he was aware that trial counsel had failed to file any post-conviction motions or appeals on behalf of the Petitioner.

In its order, the post-conviction court concluded that trial counsel provided effective assistance to the Petitioner during trial. The post-conviction court concluded that the failure of trial counsel to call Ms. Davidson to testify did "not cast doubt upon the reliability of this [P]etitioner's conviction for second degree murder[]" and that Ms. Davidson's testimony only "corroborates the fact that the [P]etitioner was involved in the sale and purchase of illicit narcotics which was the impetus (under either theory of the case) for the events that led to the victim's death." The post-conviction court also

- 18 -

concluded that the Petitioner failed to establish that trial counsel's failure to obtain the Petitioner's medical records affected the outcome of trial. The post-conviction court denied the Petitioner's petition for post-conviction relief because the Petitioner "failed to show his trial counsel provided ineffective assistance of counsel and has failed to establish prejudice resulting therefrom."[3] The Petitioner's timely appeal followed.

## II. Analysis

On appeal, the Petitioner argues that the post-conviction court erred in ruling that trial counsel rendered effective assistance because trial counsel: (1) failed to fully pursue a defense theory of voluntary manslaughter instead of self-defense; (2) requested a jury instruction that misstated Tennessee law; (3) failed to fully research and investigate potential witnesses; and (4) failed to fully research and investigate the Petitioner's medical history. The State argues that the post-conviction court correctly determined that the Petitioner had failed to show that he received ineffective assistance from trial counsel, and, therefore, the post-conviction court correctly denied relief.

### Standard of Review

In order to prevail on a petition for post-conviction relief, a petitioner must prove all factual allegations by clear and convincing evidence. *Jaco v. State*, 120 S.W.3d 828, 830 (Tenn. 2003). Post-conviction relief cases often present mixed questions of law and fact. *See Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001). Appellate courts are bound by the post-conviction court's factual findings unless the evidence preponderates against such findings. *Kendrick v. State*, 454 S.W.3d 450, 457 (Tenn. 2015). When reviewing the post-conviction court's factual findings, this court does not reweigh the evidence or substitute its own inferences for those drawn by the post-conviction court. *Id.*; *Fields*, 40 S.W.3d at 456 (citing *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997)). Additionally, "questions concerning the credibility of the witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the [post-conviction court]." *Fields*, 40 S.W.3d at 456 (citing *Henley*, 960 S.W.2d at 579); *see also Kendrick*, 454 S.W.3d at 457. The post-conviction court's conclusions of law and application of the law to factual findings are reviewed de novo with no presumption of correctness. *Kendrick*, 454 S.W.3d at 457.

---

[3] The trial court declined to address the issues of trial counsel's failure to file a motion for a new trial and a delayed appeal and the misapplication of the multiple victims enhancement factor by trial court, as those issued were either raised in the Petitioner's direct appeal or corrected by the trial court. *See* Tenn. Code Ann. § 40-30-106(h) ("A ground for relief is previously determined if a court of competent jurisdiction has ruled on the merits after a full and fair hearing.").

*Ineffective Assistance of Counsel*

The right to effective assistance of counsel is safeguarded by the Constitutions of both the United States and the State of Tennessee. U.S. Const. amend. VI; Tenn. Const. art. I, § 9. In order to receive post-conviction relief for ineffective assistance of counsel, a petitioner must prove: (1) that counsel's performance was deficient; and (2) that the deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (stating that the same standard for ineffective assistance of counsel applies in both federal and Tennessee cases). Both factors must be proven in order for the court to grant post-conviction relief. *Strickland*, 466 U.S. at 687; *Henley*, 960 S.W.2d at 580; *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). Accordingly, if we determine that either factor is not satisfied, there is no need to consider the other factor. *Finch v. State*, 226 S.W.3d 307, 316 (Tenn. 2007) (citing *Carpenter v. State*, 126 S.W.3d 879, 886 (Tenn. 2004)). Additionally, review of counsel's performance "requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689; *see also Henley*, 960 S.W.2d at 579. We will not second-guess a reasonable trial strategy, and we will not grant relief based on a sound, yet ultimately unsuccessful, tactical decision. *Granderson v. State*, 197 S.W.3d 782, 790 (Tenn. Crim. App. 2006).

As to the first prong of the *Strickland* analysis, "counsel's performance is effective if the advice given or the services rendered are within the range of competence demanded of attorneys in criminal cases." *Henley*, 960 S.W.2d at 579 (citing *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)); *see also Goad*, 938 S.W.2d at 369. In order to prove that counsel was deficient, the petitioner must demonstrate "that counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad*, 938 S.W.2d at 369 (citing *Strickland*, 466 U.S. at 688); *see also Baxter*, 523 S.W.2d at 936.

Even if counsel's performance is deficient, the deficiency must have resulted in prejudice to the defense. *Goad*, 938 S.W.2d at 370. Therefore, under the second prong of the *Strickland* analysis, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* (quoting *Strickland*, 466 U.S. at 694) (internal quotation marks omitted).

*Failure to Argue for Voluntary Manslaughter Conviction*

The Petitioner argues that trial counsel's representation was deficient because trial counsel pursued a theory of self-defense when the Petitioner was under the impression that trial counsel would pursue a theory of voluntary manslaughter. The State argues that the Petitioner has failed to establish that trial counsel's decision to pursue a self-defense theory prejudiced the Petitioner.

At the post-conviction hearing, the Petitioner testified that he believed trial counsel would pursue a theory of manslaughter because the Petitioner believed he was ineligible to argue self-defense because he was engaged in an illegal activity at the time of the offense. The Petitioner also testified that trial counsel changed the theory of defense in the middle of trial. The Petitioner stated that he felt manipulated by trial counsel and that he did not agree to a self-defense argument. Appellate counsel testified that, even though the Petitioner was engaged in unlawful activity at the time of the shooting and that he was unaware of any evidence that showed the Petitioner retreated prior to the shooting, a self-defense argument was not incompatible with the facts of the case. Mr. Lamb testified that trial counsel considered the self-defense theory in preparation of trial and ultimately decided to pursue that theory, even though trial counsel was aware of the possible issues with the defense.

The post-conviction court implicitly credited Mr. Lamb's testimony that trial counsel chose to pursue a self-defense theory over the Petitioner's testimony that trial counsel changed the theory of defense in the middle of trial by concluding that "the [P]etitioner failed to show his trial counsel provided ineffective assistance of counsel and has failed to establish prejudice resulting therefrom." In doing so, the post-conviction court implicitly determined that trial counsel chose to pursue a theory of self-defense prior to trial and that decision was reasonable and did not fall below the minimal required competency for a trial attorney. Even though trial counsel's chosen strategy might fail, such failure does not, without more, establish a deficiency. *Felts v. State*, 354 S.W.3d 266, 277 (Tenn. 2011) (citing *Goad*, 938 S.W.2d at 369). The Petitioner has failed to establish that trial counsel's decision to pursue a self-defense strategy was deficient. Because the Petitioner has failed to establish any deficiency in trial counsel's performance as it relates to his decision to pursue a theory of self-defense, we need not address whether the Petitioner suffered any prejudice as a result of trial counsel's failure to argue for a voluntary manslaughter conviction. *See Finch*, 226 S.W.3d at 316. He is not entitled to relief on this ground.

### *Request for Improper Jury Instruction*

The Petitioner also argues that trial counsel's performance was deficient because trial counsel requested a jury instruction that misstated the law of self-defense in Tennessee. The fact that trial counsel requested jury instructions that misstated the law of self-defense is undisputed. Appellate counsel testified that trial counsel requested an improper jury instruction, but the trial court rejected his request and gave a proper jury instruction on self-defense. Again, the post-conviction court did not make any specific findings of fact or conclusions of law regarding this issue. However, even if the post-conviction court had explicitly determined that this request was deficient, the Petitioner has failed to show how he was prejudiced by this request. In fact, had trial counsel obtained his requested jury instruction – which omitted any reference to the requirement that a defendant claiming self-defense be engaged in lawful activity at the time of the incident – the Petitioner's chance of acquittal would have been higher. Without showing how trial counsel's requested jury instruction prejudiced the Petitioner and that, but for this error, the outcome of the trial would have been different, the Petitioner is not entitled to post-conviction relief on this issue.

### *Failure to Call Defense Witness*

The Petitioner next argues that trial counsel provided ineffective assistance of counsel due to his failure to call Ms. Davidson as a witness. The Petitioner argues that trial counsel's failure to follow-up with Ms. Davidson resulted in the loss of Investigator Boatman's recollect of his conversation with Ms. Davidson. The State argues that the post-conviction court correctly found that the testimony of Ms. Davidson had no impact upon the reliability of the verdict rendered against the Petitioner. We agree with the State.

At the post-conviction hearing, the Petitioner testified that he asked trial counsel to call Ms. Davidson to testify at trial because she would have testified that the Petitioner was looking to purchase marijuana on August 4 and that would have shown why the Petitioner was in the area at the time of shooting. Mr. Lamb testified that trial counsel requested that he contact Ms. Davidson as part of his investigation, but he was unable to contact Ms. Davidson because she was evasive and made it known that she did not want to speak with Mr. Lamb. Mr. Lamb testified that the Petitioner told him that, prior to the shooting, the Petitioner, Mr. Patterson, and Ms. Davidson were all together inside the apartment of Ms. Sharphe, and that the Petitioner and Mr. Patterson were separating drugs in the kitchen. Mr. Lamb testified that based on this information, it was decided by trial counsel that Ms. Davidson's testimony would not be compatible with the defense theory that trial counsel chose.

The post-conviction court found that the testimony of Ms. Davidson would only establish that the Petitioner was involved in the sale and purchase of illegal substances. The post-conviction court concluded that Mrs. Davidson's testimony had no impact on the reliability of the Petitioner's second degree murder conviction and that trial counsel's failure to call Ms. Davidson did not prejudice the Petitioner. Likewise, we fail to see how Ms. Davidson's testimony would have had any impact on the Petitioner's conviction, and the Petitioner has offered no argument in favor of an opposite conclusion. We hold that the Petitioner has failed to show that he was prejudiced by trial counsel's failure to call Mrs. Davidson as a witness. The Petitioner is not entitled to relief on this ground.

### *Failure to Obtain Medical Records and a Medical Examination for the Petitioner*

The Petitioner's final argument is that trial counsel provided ineffective assistance of counsel when he failed to have the Petitioner undergo a medical examination and when he failed investigate and obtain medical records of the Petitioner's health history. The Petitioner's only argument as to why this information was relevant to his trial is that the medical information would have been crucial in developing a trial strategy. The post-conviction court ruled that the Petitioner failed to meet his burden in proving by clear and convincing evidence that a medical examination of the Petitioner would have revealed material relevant to the Petitioner's case. On appeal, the Petitioner offers no factual basis for his assertion that these medical records would have been relevant to the Petitioner's trial or what a medical examination would have revealed because he did not admit any medical records into evidence at the post-conviction hearing. Without such factual basis, the Petitioner is unable to establish prejudice, and the post-conviction court's findings were proper. *See Black v. State*, 794 S.W.2d 752, 757-58 (Tenn. Crim. App. 1990). The Petitioner is not entitled to relief on this ground.

### III. Conclusion

For the aforementioned reasons, the judgment of the post-conviction court is affirmed.

_____
ROBERT L. HOLLOWAY, JR., JUDGE

- 23 -